# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOANNE S. SEESE, | ) |
|     Plaintiff, | ) |
|     v. | ) Civil Action No. 12-235 |
| MICHAEL J. ASTRUE, | ) Judge Gary L. Lancaster |
| Commissioner of Social Security, | ) Magistrate Judge Lisa Pupo Lenihan |
|     Defendant. | ) ECF Nos. 7 and 9 |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Court 1)grant Plaintiff's Motion for Summary Judgment, in part, 2)deny said judgment, in part, 3)deny Defendant's Motion for Summary Judgment, 4)vacate the decision of the administrative law judge ("ALJ"), and 5)remand the case for further consideration.

### II. REPORT

**A. BACKGROUND**

**1. General**

Joanne S. Seese ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). Plaintiff filed for DIB on May 16,

2008, claiming an inability to work as of February 2, 2007 due to disability resulting primarily from diabetes with proliferative retinopathy, degenerative joint disease, arthritis, and venous insufficiency. (R. at 158 – 66, 255)[1]. This matter comes before the court on cross motions for summary judgment. (ECF Nos. 7, 9).

Plaintiff was born on October 30, 1964, and was forty five years of age at the time of her administrative hearing before the ALJ. (R. at 158). Plaintiff lived with her husband and fifteen year old daughter. (R. at 56). She maintained a driver's license. (R. at 37). She was last employed full-time in January 2007, performing medical records correspondence for a copying service, prior to undergoing two surgical procedures on her knees. (R. at 46 - 48). She claimed that she was no longer capable of full-time work as of February 2, 2007, at which time she returned to her former position on a part-time basis working three-and-one-half to four-and-one-half hours per week. (R. at 46 - 47, 58).

When at home, Plaintiff was capable of preparing meals, performing household chores, paying bills, running errands, shopping for groceries, and taking family members to and from appointments. (R. at 228, 266 – 68). Plaintiff visited with family, attended church functions, and watched her husband and daughter's sporting events several times per week. (R. at 232, 269). Plaintiff also cared for her elderly father. (R. at 229, 265). Her knees and back caused her significant discomfort, and often woke her at night. (R. at 229). Pain medication was increasingly less effective. (R. at 237). Sometimes Plaintiff had difficulty putting on her shoes and socks, and getting in and out of her bathtub. (R. at 229, 266). She tried to elevate her legs above heart level for an hour or two every afternoon to relieve pain and swelling. (R. at 265).

---

[1] Citations to ECF Nos. 3 – 3-14, the Record, *hereinafter*, "R. at __."

**2. Medical Record**

As far back as November 2005, Plaintiff's primary care physician, Anthony Spinola, M.D. noted that Plaintiff experienced crepitance in the knees – accompanied by discomfort and stiffness – as a result of osteoarthritis. (R. at 383 – 84). Celebrex had helped to keep her pain under control. (R. at 383 – 84). Eventually, however, Dr. Spinola felt that Plaintiff's knee pain was not responding to conservative treatment and required surgery. (R. at 378).

In June 2005, Plaintiff first visited orthopedic surgeon Michael J. Rogal, M.D. for treatment of the pain in her knees. (R. at 415). A plan of conservative treatment was outlined. (R. at 415). It was ultimately unsuccessful. On February 1, 2007, Dr. Rogal performed an arthroscopy of Plaintiff's left knee with lateral retinacular release and loose body excision, due to relatively incapacitating anterior knee pain. (R. at 402, 413). Diagnostic imaging corroborated Plaintiff's complaints of pain, showing severe degeneration. (R. at 415). Following surgery, Dr. Rogal characterized Plaintiff's condition as grade 3 lateral, grade 3 anterior, and grade 2 medial compartment degenerative arthritis, with severe patellar maltracking, and including a loose body. (R. at 402). Plaintiff did well post-operatively. (R. at 407). Dr. Rogal indicated, however, that due to a significant amount of pre-existing degenerative arthritis, Plaintiff could still experience pain following her surgery. (R. at 411).

On April 12, 2007, Dr. Rogal performed an arthroscopy of Plaintiff's right knee with lateral retinacular release and limited anterior synovectomy. (R. at 432). Following the completion of the procedure, Dr. Rogal characterized Plaintiff's right knee condition as grade 4 anterior, grade 3 lateral compartment degenerative arthritis with patellar maltracking. (R. at 432). In a follow-up examination, Dr. Rogal observed that Plaintiff experienced some instability in her left knee, and some diffuse right knee pain. (R. at 439). He noted, however, that she was

planning to return to work. (R. at 439). She was also planning to apply for disability insurance benefits through the Social Security Administration, but Dr. Rogal believed that she might have difficulty receiving said benefits. (R. at 439). He did not indicate why this would be the case.

In May 2007, Dr. Rogal recommended that Plaintiff avoid ladders and roofs because of instability in her knees. (R. at 440). He also recognized that Plaintiff had significant degenerative arthritis and would likely continue to experience pain. (R. at 440). In order to avoid exacerbating her arthritis, Plaintiff was to avoid squatting, kneeling, running, jumping, climbing, crawling, too many steps, too many hills, and high-heeled shoes. (R. at 471).

A physical residual functional capacity assessment ("RFC") of Plaintiff was completed by state agency evaluator Juan B. Mari-Mayans, M.D. on July 19, 2007. (R. at 443 – 49). Dr. Mari-Mayans diagnosed Plaintiff with osteoarthritis of the knees, osteopenia, and diabetes mellitus based upon a review of the medical record. (R. at 443 – 49). As a result of her impairments, Plaintiff would be limited to occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds, standing and walking approximately six hours of an eight hour work day, and sitting six hours (R. at 443 – 49). Plaintiff was considered to be partially credible, but that based upon the success of her treatment, her stated activities of daily living, and other evidence on record, Plaintiff was not as limited as claimed. (R. at 443 – 49).

Dr. Rogal examined Plaintiff again in October 2007, and observed that Plaintiff's knees felt better and exhibited decreased grinding, but that there was still intermittent pain as a result of arthritis. (R. at 462). While Plaintiff's ligamentous stability was still intact, diagnostic imaging showed that there was severe anterior and moderately severe medial compartment degenerative arthritis of the left knee, and severe anterior and moderate medial compartment degenerative arthritis of the right knee. (R. at 462). Plaintiff contacted Dr. Rogal in May 2008 because of

continued discomfort in her knees. (R. at 461). Dr. Rogal found that Plaintiff was experiencing venous insufficiency in her lower extremities, partly as a result of weight gain, and partly as a result of decreased use due to knee pain. (R. at 461). Plaintiff was advised to treat the swelling in her legs by elevating her extremities above the level of the heart, avoiding long periods with her feet hanging in the standing or sitting position, pumping her feet and ankles back and forth, using compression hose, and reducing body weight. (R. at 461). Plaintiff was to continue with her anti-inflammatory medication, and was recommended for acid lubricant injections because cortisone had been ineffective. (R. at 461).

In February and August 2008, Dr. Spinola noted that Plaintiff continued to complain of difficulty with her knees, and that further injections and eventual knee replacement would likely be necessary. (R. at 487). Plaintiff also reported low back pain which was aggravated by flexion, prolonged sitting, and prolonged standing. (R. at 487). Plaintiff did not report temperature intolerances or numbness. (R. at 490).

Another physical RFC was completed by state agency evaluator Dilip S. Kar, M.D. on August 21, 2008. (R. at 506 – 12). Plaintiff's impairments included diabetes mellitus, retinopathy, arthritis, and venous insufficiency. (R. at 506 – 12). Following a review of Plaintiff's medical record, Dr. Kar concluded that Plaintiff was capable of occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds, standing and walking at least two hours of an eight hour workday, sitting approximately six hours, and occasionally climbing, balancing, stooping, kneeling, crouching, and crawling, but could not be exposed to workplace hazards such as machinery or heights. (R. at 506 – 12). Dr. Kar did not feel that the conclusions reached were significantly different from those made by Plaintiff's treating medical sources, and further bolstered the RFC findings by citing to Plaintiff's extensive activities of

5

daily living, responsiveness to surgery, lack of assistive devices to ambulate, and alleged lack of prescription pain medication use. (R. at 506 – 12).

Plaintiff was seen by Zonfu Chen, M.D. at a pain management clinic beginning in August 2008. (R. at 513 – 18). Dr. Chen noted that Plaintiff had swelling in her legs and feet, joint pain, and stiffness. (R. at 513 – 18). Plaintiff had observable tenderness in the left shoulder, but she had good range of motion. (R. at 513 – 18). There was also tenderness over the L5, S1, and paraspinous muscles, bilaterally. (R. at 513 – 18). Yet, Plaintiff exhibited full strength, had negative straight leg raising, and a negative Patrick test. (R. at 513 – 18). Dr. Chen prescribed a TENS unit, as well as analgesic and anti-inflammatory medication for Plaintiff's back, shoulder, and knee pain. (R. at 513 – 18). He further advised Plaintiff to consider injections for pain relief. (R. at 513 – 18). Plaintiff's overall pain improved through October 2008 with treatment at the pain clinic, although Plaintiff complained that her knees had worsened. (R. at 513 – 18).

Plaintiff returned to Dr. Rogal beginning in January 2009. (R. at 639). She wished to try injections for continued knee pain. (R. at 639). Dr. Rogal noted that in addition to suffering degenerative arthritis of the knees, Plaintiff also experienced venous insufficiency in her lower extremities. (R. at 639). Plaintiff returned for injections on April 1, 2009. (R. at 636 – 37). At that time she began to complain of left shoulder pain which started two months prior. (R. at 637). Plaintiff exhibited impingement with forward flexion and internal rotation of her shoulder. (R. at 637). She had weak external rotation strength. (R. at 637). Dr. Rogal also observed that Plaintiff's knees still exhibited signs of degenerative arthritis. (R. at 637). He noted venous insufficiency in the lower extremities, as well. (R. at 637).

Plaintiff returned for follow-up knee injections on April 10, 2009, and continued to complain of left shoulder pain. (R. at 632). Dr. Rogal diagnosed left frozen shoulder and

impingement syndrome. (R. at 632). After receiving a third round of injections to her knees on April 15, 2009, Plaintiff informed Dr. Rogal that she experienced much relief. (R. at 631). However, Plaintiff continued to see Dr. Rogal for complaints of left shoulder pain (R. at 630) and Plaintiff's shoulder continued to exhibit signs of impingement and degenerative arthritis. (R. at 627 – 30).

On November 27, 2009, Dr. Rogal performed a manipulation, arthroscopy with subacromial decompression, mumford claviculectomy, biceps tendon release, and adhesiolysis of Plaintiff's left shoulder. (R. at 534 – 36). Following the procedure, Dr. Rogal diagnosed Plaintiff with mild left shoulder adhesions, rotator cuff erosion, biceps tendon inflammation and erosion, and severe left acromioclavicular degenerative arthritis. (R. at 534 – 36). Plaintiff had not been responsive to physical therapy and a conservative treatment program. (R. at 527). Her pain had become persistent. (R. at 527). Subsequently, Plaintiff was noted to be doing well. (R. at 626).

On December 28, 2009, Plaintiff underwent a physical capacity examination with occupational therapist Edward Cook. (R. at 665 – 71). Mr. Cook observed no antalgic gait, and normal arm swing with ambulation. (R. at 665 – 71). Plaintiff demonstrated good body mechanics with floor to knuckle lifting of twenty pounds, but poor mechanics when lifting ten pounds over the head. (R. at 665 – 71). Knee pain was reported with pushing and pulling activity. (R. at 665 – 71). Plaintiff ambulated for twenty minutes at approximately one-and-one-half miles per hour with no change in her gait pattern – although, Plaintiff did report knee and calf symptoms while walking. (R. at 665 – 71). Plaintiff was able to ascend and descend eighteen stairs with the use of a handrail. (R. at 665 – 71). Other testing showed that Plaintiff could frequently stand, sit, walk, stoop, and climb stairs. (R. at 665 – 71). Plaintiff could

occasionally squat and kneel. (R. at 665 – 71). Plaintiff reported her pre and post-testing pain at 6 and 5, respectively, on a pain scale of 10. (R. at 665 – 71). Mr. Cook concluded by stating that he thought Plaintiff was capable of light work. (R. at 665 – 71).

On January 19, 2010, Dr. Spinola wrote a letter on behalf of Plaintiff for purposes of receiving disability benefits. (R. at 672). The letter stated that as a result of knee and shoulder pain, Plaintiff could not work a full-time schedule. (R. at 672). Dr. Spinola also stated that Plaintiff had been continually treated for these ailments. (R. at 672).

### 3. Administrative Hearing

At her hearing before the ALJ, Plaintiff testified that she became disabled following her two knee surgeries. (R. at 46 – 47). She was allegedly only capable of returning to her former place of employment on a part-time basis. (R. at 47). Plaintiff worked for a medical records copy service. (R. at 48). Her job primarily consisted of retrieving and copying medical files for the copying service's clients. (R. at 48). According to Plaintiff, this job involved "sitting down, standing up, running down the hallway… a lot of moving around." (R. at 48). She frequently moved between rooms and floors in her place of employment. (R. at 48 – 49). Plaintiff had to physically pull medical records, often from above her head. (R. at 49, 51).

Plaintiff claimed that she was limited to part-time performance of these duties because of pain, swelling, and limited range of motion in her knees and shoulders. (R. at 51 – 52, 60). Injections, medications, and surgery provided little lasting relief for her conditions. (R. at 53). On a normal day, her knee pain was 8 on a pain scale of 10. (R. at 63). Two or three days of each week, the pain was worse. (R. at 63). Plaintiff asserted that she had to raise her knees above the level of her heart and apply ice to reduce swelling twice each day prior to dinner. (R. at 55, 59). She elevated her legs again before bed. (R. at 60).

Plaintiff explained that she was capable of driving regularly, independently running errands, grocery shopping, and visiting her elderly father in a nursing home. (R. at 54). Plaintiff also cooked regular meals for her family, did light housework, and fed her pet cats. (R. at 55 – 56). Plaintiff's hobbies included reading and crocheting. (R. at 57). However, Plaintiff was allegedly unable to continue crocheting because of her shoulder issues. (R. at 57). She taught a children's religious education class at her church every Wednesday night, attended sporting events for her daughter and husband, and was capable of traveling to Mexico for a vacation. (R. at 57 – 58, 62). Plaintiff believed that she could lift a gallon of milk with both hands. (R. at 65). She could stand in one position for five or ten minutes. (R. at 65). She could walk on a flat surface for approximately one half mile. (R. at 66). Plaintiff could sit for about forty five minutes. (R. at 66).

Plaintiff stated that following her knee surgeries, when her husband received a pay cut at work, she did attempt to return to work additional hours. (R. at 61). She stopped taking these extra hours after two or three months, because by the end of the work day she was too exhausted to teach at her church on Wednesday night. (R. at 61 – 63). Her knees also became extremely painful. (R. at 62). When Plaintiff returned to her part-time work schedule, she was able to teach at church again. (R. at 62).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would qualify for a significant number of jobs in the national economy if limited to sedentary work. (R. at 70). The hypothetical person would be further limited to only occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing, only occasional pushing and pulling with upper and lower extremities, including the use of hand levers or foot

9

pedals, and no exposure to machinery or unprotected heights. (R. at 70 – 71). The vocational expert replied that such a person would be capable of working as an "ink printer," with 75,000 jobs available in the national economy, as an "addressing clerk," with 70,000 jobs available, or as a "charge account clerk," with 85,000 jobs available. (R. at 71).

Plaintiff's counsel then proceeded to ask the vocational expert whether the hypothetical person would still be eligible for a significant number of full-time jobs if required to elevate his or her legs above heart level one to two hours per work day on a random basis. (R. at 71). The vocational expert responded that such a person would not be able to work full-time. (R. at 72). The vocational expert went on to say that the hypothetical person would also be expected to stay on-task at work at least ninety percent of the time, and could miss no more than two days of work per month. (R. at 72). Also, a hypothetical individual whose ability to sit, stand, and walk, collectively, was restricted to less than eight hours per day, could not engage in full-time work. (R. at 72).

B.     ANALYSIS

**1. Standard of Review**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

**2. Discussion**

In his decision, the ALJ found that Plaintiff experienced medically determinable severe impairments in the way of malignant otitis external, diabetes mellitus, venous insufficiency, residual effects of a fractured metatarsal right foot, osteoarthritis of her bilateral knees, residual effects of bilateral knee surgeries, disorders of the cervical spine, and residual effects of bilateral shoulder surgeries. (R. at 22). The ALJ determined that with such impairments, Plaintiff was

limited to sedentary work, with no more than occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing, only occasional pushing and pulling with upper and lower extremities, including the use of hand levers or foot pedals, and no exposure to machinery or unprotected heights. (R. at 23). Despite these limitations, and based upon the testimony of the vocational expert, the ALJ concluded that Plaintiff was capable of engaging in a significant number of jobs in existence in the national economy. (R. at 29 – 30). Plaintiff was, therefore, ineligible for benefits.

Plaintiff objects to the determination of the ALJ, arguing that he erred in failing to properly credit the opinions of Plaintiff's treating physicians, including a requirement that Plaintiff elevate her legs to relieve knee pain and swelling, thus resulting in an incomplete hypothetical question and RFC assessment. (ECF No. 8 at 17, 20). Defendant counters that the physicians' opinions were properly credited, that Plaintiff's need to elevate her legs did not preclude full-time work, and that the opinion of the ALJ was well-supported by substantial evidence. (ECF No. 10 at 14).

With respect to Plaintiff's first argument, the Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649

F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Brownawell*, 554 F. 3d at 355. Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).

In making his determination, the ALJ should be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981). The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli v. Massanari*, 247 F. 3d 34, 42 (3d Cir. 2001). The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F. 3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F. 2d 1058, 1066 (3d Cir. 1993)). Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F. 2d 64, 70 (3d Cir. 1984).

As argued by Plaintiff, Dr. Rogal – having a long, established treatment history with Plaintiff – advised her to treat her knee pain and swelling by elevating her legs above the level of her heart, and by avoiding long periods of time with her feet hanging down in the standing or sitting position. ECF No. 8 at 18; ECF No. 11 at 3 n. 2; (R. at 461). Plaintiff claimed that she followed Dr. Rogal's directive, out of necessity, two to three times per day in the afternoon and evening to reduce significant pain and swelling in her legs. (R. at 55, 59 – 60). At the administrative hearing, the vocational expert clearly testified that someone with such a need to elevate the legs would not be able to maintain full-time employment. (R. at 71 – 72).

14

Yet, the ALJ's decision is totally lacking with respect to a discussion of Plaintiff's need to elevate her legs. In light of the clear impact such a limitation could have on an individual's ability to work, it was imperative that the ALJ discuss such medical findings. He did not. To conclude that such an opinion is supported by substantial evidence "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Stewart v. Sec'y of Health, Educ. and Welfare*, 714 F. 2d 287, 290 (3d Cir. 1983) (quoting *Arnold v. Sec'y of Health, Educ. and Welfare*, 567 F. 2d 258, 259 (4th Cir. 1977)). A more thorough analysis is required.

The court need not address the remainder of Plaintiff's arguments in light of the ALJ's failure to provide a proper discussion of the entire record.

### C. CONCLUSION

Based upon the foregoing, the ALJ failed to thoroughly review the evidentiary record when coming to his ultimate conclusion to deny DIB to Plaintiff, and, therefore, this court cannot conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be granted to the extent remand for reconsideration is requested and denied to the extent reversal and an immediate award of benefits is sought.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony

need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: November 2, 2012
cc/ecf: All counsel of record.